No. 2321
Second Circuit Appeal

FOSTER COUVILLION v. G. W. ZODER

(June 6, 1925, Opinion and Decree)

---

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Automobiles—Par. 7; Negligence—Par. 1, 25.**

In an automobile collision where the evidence shows that both the plaintiff and defendant were negligent the plaintiff can not recover nor can the defendant recover on a reconventional demand.

2. **Louisiana Digest — Automobiles — Par. 4 (d):**

In an automobile collision where it is shown that the speed of the plaintiff was between thirty-five and forty-five miles per hour which was against the law, the plaintiff is guilty of negligence and cannot recover for the damages done to him or his car.

3. **Louisiana Digest—Automobiles—Par. 7; Negligence—Par. 25.**

In an automobile collision where it is shown that the defendant swerved his car to the left of the road in front of plaintiff's rapidly approaching car, and thereby caused the plaintiff to think that defendant was turning into that side, the defendant is guilty of contributory negligence and cannot recover in reconvention of the plaintiff for damages to himself or his car.

(Civil Code, Art. 2315. Editor's note.)

Appeal from the Thirteenth Judicial District Court of Louisiana, Parish of Rapides, Hon. L. L. Hooe, Judge.

In this case, Foster Couvillion sues defendant, G. W. Zoder, for $1335.00 damages for injury caused in an automobile collision. Defendant denies liability and prays, in reconvention, for $1524.00 damages caused by said collision.

On this issue the case was tried. There was judgment in favor of defendant, rejecting plaintiff's demand at his cost, and judgment in favor of plaintiff rejecting defendant's demand in reconvention. Plaintiff appealed. Defendant answered the appeal.

Judgment affirmed.

Peterman, Dear and Peterman, of Alexandria, attorneys for plaintiff, appellant.

White, Holloman & White, of Alexandria, attorneys for defendant, appellee.

OPINION.

REYNOLDS, J. The question to be decided is essentially one of fact.

Plaintiff testified, page 11:

"Q. For what distance is that road straight below the packing house, down the river?

"A. I imagine it is about a half-mile between the packing house and the first curve.

"Q. And from the packing house toward Alexandria?

"A. About a half-mile, may be not quite that much.

"Q. How far were you from Mr. Zoder when you first saw him?

"A. Well, I was a good distance, I don't know but I imagine about a quarter of a mile I could see his car coming.

"Q. Now, I understood you to tell your counsel that when you first saw him he was on his left-hand side of the road?

"A. Yes, sir, when I first saw him.

"Q. That was prior to the time that he made the turn into the gate?

"A. Yes, sir.

* * *

Page 12.

"Q. How far were you from him when he started to make the turn?

"A. Oh, when he started to make the turn I was right within twenty feet of him."

Lee Couvillion, a brother of plaintiff, testified, page 21:

"Q. How far away was it when you first observed it?

"A. A pretty good distance.

"Q. Could you give an estimate as to how far you think it was away from you when you first observed it?

"A. Possibly a thousand yards.

"Q. The road is straight there?

"A. Yes, sir.

Page 22.

"Q. When you first observed him, on which side of the road was he?

"A. The river side, the left-hand side.

"Q. That would be the same side as your brother's car was on?

"A. Yes, sir.

"Q. Are you positive of that?

"A. Yes, sir.

Page 24.

"Q. Are you sure that Mr. Zoder was on the left side of the road?

"A. Absolutely the whole time.

Page 25.

"Q. I don't think you understood me. I asked you if your brother started to swerve to the left at the time that Mr. Zoder swerved his car to the left in order to make the turn into the gate?

"A. He was always on the left—his car was always on the left."

Under this testimony it appears that plaintiff saw defendant driving car on the wrong side of the road for approximately a quarter of a mile distant from the place of the accident. This should have been to him a signal reading: "Danger, Drive Slowly"; but instead of plaintiff heeding the signal he proceeded towards the defendant's car coming toward him on the wrong side of the road until within from twenty to one hundred feet of defend ant at a rapid rate of speed of from thirty-five to forty-five miles an hour. (Monroe Brasher, p. 57, "To look at it from the side it was going at a terrible rate of speed"; W. P. Hudson, page 50, "I judge that the car was going at a pretty good speed from the distance that it slipped, from the way that it tore up the gravel road.)

Nowhere does the plaintiff contradict this testimony as to the rate of speed. His counsel says that the rate of speed is of no importance, but we think it is; for when the driver of an automobile sees another automobile approaching him on the wrong side of the road he owes it to the general public to get his own car under control, and had the plaintiff reduced the speed of his own car to the speed of the car he was approaching (G. W. Zoder, page 34, "I was * * * making about four or five miles an hour, I judge") the accident would not have happened; and we think it was negligence for the plaintiff to drive his car at such a high rate of speed to within less than 100 feet of a car approaching him on the wrong side of the road.

Section 19 of Act 120 of 1921 provides:

"That subject to parochial and municipal regulations, every person operating a motor vehicle on any highway or road in this state shall run it at a rate of speed at no time greater than is reasonable and proper, having regard to the traffic and use of the highway or road and the safety of the public. It shall be prima facie evidence of a speed greater than is reasonable and proper as aforesaid if any motor vehicle is operated on any highways outside of an incorporated municipality at a rate of speed exceeding thirty-five (35) miles per hour for a distance greater than one-half a mile continuously. It shall be prima facie evidence of a rate of speed greater than is reasonable and proper as aforesaid if a motor vehicle is operated on any highway or street inside an incorporated town or city at a rate of speed greater than fifteen (15) miles per hour for a distance of one-eighth of a mile, or at a rate of speed greater than ten miles

an hour where the chauffeur's view of the road traffic is obstructed whether upon approaching the intersection of highways or roads, or in traversing a railway or highway crossing intersection, or in going around a corner or curve in a street or highway."

And ordinance of the Police Jury of the Parish of Rapides provides:

"Section 1. Be it ordained by the Police Jury of Rapides Parish in regular session convened, That it shall be unlawful for any automobile, truck or other vehicle of motor power, to be driven over the public roads of Rapides parish, by any person or persons, at a greater rate of speed than twenty-five (25) miles per hour; and that the speed limit on all such vehicles while passing through any of the towns and villages of Rapides parish shall not exceed the rate of fifteen (15) miles per hour. "Section 2. Be it further ordained, That all such motor vehicles shall * * * being operated during the day or night, shall, while meeting and passing on the public roads any other motor car of vehicle of any kind, slow down to a speed of not to exceed fifteen miles per hour; and must pass on the extreme right of said highway according to the direction being traveled."

Under the above quoted act and ordinance and the other evidence in this case plaintiff clearly is not entitled to recover.

The evidence as a whole, we think, preponderates in favor of the position of the defendant's contention that he was driving his car on the right side of the road and that at all times plaintiff could have passed his car on the right side of the road without causing a collision.

W. C. Hudson, a witness for plaintiff, testified, page 15:

"Q. In what direction did those tracks go?
"A. He turned to his left, or toward the river, to go into the packing house, and it looked like he had got about half-way across the road to where Mr. Couvillion's car hit him and knocked him around."

G. W. Zoder testified, page 33:

"Q. When you made that turn, how far to the left did you turn?
"A. Well, I don't think I went in beyond the center of the road, probably the left-hand wheel of my car was possibly a little over the center of the road, just enough to give me a little turn in there.

Page 34.

"Q. Prior to the time that you made the turn, you said that you were driving down on your right-hand side?
"A. Yes, sir.

Page 35.

"Q. What is the width of the road between the ditches?
"A. Twenty-nine feet, level ground.
"Q. What kind of road is it?
"A. Gravel road.
"Q. At the time that your car turned out, to the left, tell the court whether or not there was room for Mr. Couvillion to pass between you and the ditch on the river side of the road?
"A. Yes, sir, I think there was, I am sure there was.
"Q. Was there ever any time when there was not room for him to pass on that side?
"A. No, sir.

W. P. Hudson testified, page 49:

"Q. Judging from his tracks, how far to his left and your left did he turn out before turning to the right to enter the gate?
"A. Just about the center of his car was about the center of the road, as near as I could judge from the tracks.

Page 53.

"Q. Didn't you all look at the tracks of the car, Mr. Zoder's tracks, together?
"A. Well, we were having a general discussion of the accident as it occurred there. There were several present. In fact, most of the Rapides Packing Company had gone out there, Tom Hincey and Bill Rush. I never took notes of who was present; I brought Zoder back to town in my car."

Monroe Brasher testified, page 57:

"Q. Taking up first the tracks of the Ford car—Mr. Zoder's car—state to the court what they indicated as to his position in the road as he turned to make the drive into the gate.

"A. Well, I didn't measure the exact distance, that is, with a ruled tapeline, but, judging from the eye, was on the right-hand side of the road until he got about fifteen or twenty feet before he reached the packing house gate, he swerved slightly to the left, placing his left wheel a little past the center; I don't believe the middle of the car would have been the middle of the road before he turned to our gate.

### Page 59.

"Q. How many feet was it from the left tracks of the left-hand wheel from the ditch on the river side?

"A. Well, I consider that the road was about thirty feet, and if that be the case, the center of the road would be fifteen. I don't think that his left wheel was over a foot from the center of the road—and that would leave fourteen feet from his tracks to the ditch.

### Page 60.

"Q. Now, the tracks that you saw extending toward Alexandria, on which side of the road were they?

"A. Until he turned, swerved to the left to make his turn into the packing house, he was on his right-hand side."

W. D. Rush testified, page 62:

"Q. Did you make an examination at that time of the tracks of Mr. Zoder's car?

"A. Yes, sir.

* * * *

"Q. Could you state about where his left tracks were with reference to the center of the road at that time?

"A. Do you mean the extreme point?

"Q. Yes, at that time that he was closest to the river side.

"A. A little nearer to the river side of the road, a little beyond the center of the road, a little nearer than they were on the other side."

T. R. Hincy testified, page 67:

"Q. Well, if you examined Mr. Zoder's tracks, can you tell the court what course he followed as he prepared to go into the gate?

"A. Yes, sir, I think I can. I would judge about fifteen or twenty feet before he got to the gate, when he turned into the left to make the turn into the gate— I would judge that the left-hand wheel of his car was maybe over a foot from the middle of the road when he was closest to the river side of the road, it could not have been more than a foot.

"Q. Did you gentlemen look at this together and discuss it at that time?

"A. I think everybody was looking at it. We decided that the best thing that each one of them could do was to pay their bills and call it a draw; that's the way that we looked at it."

From all of the testimony we are convinced that the defendant swerved his car to the left of the road in front of plaintiff's rapidly approaching car and thereby caused the plaintiff to think that defendant was turning into that side. This, in our opinion, was such negligence as to prevent him from recovering on his demand in reconvention.

Under all the law and the evidence we think the judgment of the District Court is correct and accordingly it is affirmed.